Ingram-Richardson, Inc. v. Commissioner.
Ingram-Richardson v. Commissioner
Docket No. 2079-69.
United States Tax Court
T.C. Memo 1972-157; 1972 Tax Ct. Memo LEXIS 99; 31 T.C.M. (CCH) 779; T.C.M. (RIA) 72157; July 27, 1972
*99 Transferor sold substantially all of its noncash assets to petitioner on November 17, 1965, pursuant to a plan of complete liquidation previously adopted in accordance with sec. 337, I.R.C. 1954. Held, that the fair market values of transferor's land improvements, buildings and machinery and equipment were $22,000, $355,000 and $72,708, respectively, as of November 17, 1965; an allocation of the lump sum sales price according to relative fair market values for the purpose of determining transferor's ordinary gain under sec. 1245, I.R.C. 1954, made accordingly. Hugh Calkins, Wallace M. Wright and John L. Sterling, 1750 Union Commerce Bldg., Cleveland, Ohio, for the petitioner. Larry L. Nameroff, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined deficiencies in the income tax of petitioner's transferor in the amount of $5,087.44 for the taxable year 1962 and in the amount of $170,390.61 for the taxable period January 1, 1965 to November 17, 1965. This proceeding involves the liability of petitioner as transferee of assets of the transferor. Certain concessions have been made by the parties, and the only remaining issues for our decision *100 are: (1) What were the fair market values, as of November 17, 1965, of certain assets in order to determine the proper allocation, between items of section 1245[1] property and items of nonsection 1245 property of the lump sum sales proceeds resulting from a sale by transferor to petitioner of substantially all of transferor's noncash assets pursuant to transferor's liquidation under the provisions of section 337. The ultimate income tax question involved concerns the computation of ordinary gain resulting from the disposition of section 1245 property during the taxable period January 1, 1965 to November 17, 1965; such computation requires a determination of what portion of the lump sum sales proceeds should be allocated to the section 1245 property according to a formula based on relative fair market values of the assets so transferred. (2) If the above-described determination results in an allocation of the lump sum sales proceeds to accounts receivable in an amount less than the basis of such accounts receivable, the issue is presented as to whether the loss thus incurred on the *101 disposition of the accounts receivable is recognizable under the provisions of section 337(b)(1)(B). The deficiency determined with respect to the taxable year 1962 relates to the disallowance of a net operating loss carryback from the taxable period January 1, 1965 to November 17, 1965. Our decision for the latter period automatically resolves the issue for the former period. Findings of Fact Some of the facts have been stipulated, and such facts together with the stipulated exhibits are incorporated herein by this reference. Ingram-Richardson, Inc., (not the petitioner in this case and hereinafter sometimes referred to as old Ingram-Richardson) was organized as an Indiana corporation in 1933. On November 12, 1965, old Ingram-Richardson changed its name to I-R, Inc. Subsequently, in 1965 I-R, Inc. (hereinafter sometimes referred to as transferor) sold substantially all of its noncash assets to the petitioner in this case, Ingram-Richardson, Inc., i.e., new Ingram-Richardson, an Indiana corporation incorporated on November 12, 1965. At the time the petition herein was filed, petitioner's principal place of business was, and its transferor's principal place of business had been, located *102 at Frankfort, Indiana. Transferor's Federal income tax returns for the calendar year 1962 and for the 780 period January 1, 1965 to November 17, 1965, were filed with the district director of internal revenue, Indianapolis, Indiana. Transferor was until November 17, 1965, (after which time its business was continued by petitioner as its transferee), engaged in the manufacture of porcelain enamel frit, which was sold to major manufacturers of refrigerators, stoves and other appliances. Transferor was also engaged in the fabrication and enameling of bathtubs, sinks and other plumbingware items, and job enameling or custom porcelain enameling for large manufacturers of various products utilizing porcelain enameled steel components. Metal fabrication, however, was not a significant part of the business. At all times relevant to this proceeding, transferor's books and accounting records were kept, and its Federal income tax returns were filed, on the accrual basis method of accounting. Some of its sales were on open account and were reflected on its books and tax returns as accounts receivable. As an accrual basis taxpayer, transferor had included the full face value of receivables in its *103 gross income for Federal tax purposes. For the period from January 1, 1945 through November 17, 1965, transferor's net sales and after-tax earnings were as follows (in thousands of dollars): After-Tax
Year
Net Sales
Earnings
1945
$1,653
$ 103
1946
2,740
257
1947
3,607
313
1948
3,751
428
1949
3,152
313
1950
4,421
497
1951
3,395
259
1952
3,354
214
1953 4,233
280
1954
4,625
374
1955
5,274
416
1956
4,948
329
1957
3,843
209
1958
4,076
254
1959
4,510
274
1960
3,585
181
1961
3,723
129
1962
3,190
70
1963
3,484
128
1964
3,971
160
1965 (to Nov. 17)
3,167
2
As the above table illustrates, declines in transferor's annual net sales were accompanied by a sharper drop in its after-tax earnings, beginning in the late 1950's and continuing through 1965. Between January 1, 1962 and September 7, 1965, the approximate range of the high and low bid prices for transferor's stock in the over-the-counter market was as follows: Bid Prices
Year
High
Low
1962
$7
$5
1963
6
4
1964
8
5 1/2
1965 (to September 7)
8 1/2
7 1/4 In 1964, transferor, by means of a tender offer, purchased 32,039 shares of its own stock at a price of $7.125 per share. Principal among those who tendered their shares at that price were tow members of transferor's board of directors, Raymond J. Coin (its chairman) and *104 Fred Ingram. Transferor's former parent company in Beaver Falls, Pennsylvania, also in the porcelain enameling business, had been sold in the early part of 1965, and before the date of trial, had gone out of operation. From about 1957 to 1968 there were no less than 13 failures in the industry. Its markets were shrinking and its principals were discouraged about the future and expected the business to continue to go downhill. Few new products that would consume large amounts of frit were being developed, and some of those manufacturers that had depended on transferor and its competitors for porcelain enameling work were installing their own facilities. Stainless steel, plastics and other products were encroaching on the market previously served by frit. In November of 1965, the financial prospects for transferor and other companies engaged in the same industry were not encouraging. Transferor's earnings were down and had been for several years below the levels that had prevailed until the 1960's. Transferor had lost one major customer in 1965 and had no reason to expect either sales or profits to make any substantial recovery. Many of its costs were rising, and it, being a small company, *105 experienced difficulty in maintaining its competitive position. At a special meeting on October 6, 1965, transferor's shareholders voted, in person or by proxy, to adopt a plan of complete liquidation and approved the sale of substantially all of transferor's noncash assets to Cuyahoga Management Corporation. The effect of this sale would be to produce, when coupled with cash on hand and in banks, a liquidating distribution to shareholders equal to $11.40 per share, a value more than 50 percent higher than the amount realized by those who sold shares 781 in response to transferor's tender offer only one year earlier. Of the 171,704 shares represented in person or by proxy (97 percent of the outstanding stock), 164,729 were voted in favor of the plan and sale of assets and 6,975 were voted against. None of the transferor's shareholders exercised dissenter's rights with respect to the sale. Cuyahoga Management Corporation is an Ohio corporation owned by Ball, Burge & Kraus, a Cleveland, Ohio investment banking firm, (hereinafter sometimes referred to as BB&K) and by members and employees of that firm. The group consisting of Cuyahoga Management Corporation and BB&K will hereinafter sometimes *106 be referred to as the original purchasing group. The negotiations for the transaction were handled on behalf of the original purchasing group by BB&K. The original purchasing group would not have entered the industries in which transferor was engaged by starting up a new facility of its own because the investment in equipment and plant which a new facility would have required, when compared with the profits that could have been expected in these industries, would have been prohibitive. At the time of the final offer to purchase, BB&K knew that transferor's earnings had deteriorated somewhat, that it had lost a major customer and that costs were rising. There was, in fact, some resistance within the original purchasing group to taking over transferor's operations. However, the group decided in favor of the purchase and intended to operate the business as a going concern. BB&K concluded that the acquisition of the transferor's business was a good transaction and would be profitable. Neither transferor nor the original purchasing group was under any pressure or compulsion whatsoever to consummate the transaction. Although the original purchasing group hoped for a profitable transaction, *107 they did not regard the transaction as one which was exceptionally advantageous to them. Several years earlier, in 1961, the original purchasing group had made an offer to transferor that was approximately $182,000 in excess of the offer that was made in 1965. The lower offer in 1965, reflected the substantial deterioration in transferor's earning power. Those consulted by transferor were uniformly of the opinion that the final 1965 offer by the original purchasing group was a fair one and should be accepted. Among those consulted who indicated that they favored acceptance of the 1965 offer were the following: Fred Ingram - A director of transferor who knew the business quite well and had had difficulties with his own porcelain enameling company, the former parent company located in Beaver Falls, Pennsylvania; that company had been sold earlier in the same year. Raymond J. Coin - Chairman of transferor's Board of Directors, and its principal stockholder; he had served as transferor's President and General Manager for many years. Gordon Cohen - The underwriter of transferor's public offering of stock in the over-the-counter market in 1955. Transferor's auditors Transferor's attorneys *108 In 1965, prior to the transaction involved herein, BB&K secured the services of a real estate broker, John A. Wallace, to appraise the real estate portion of transferor's assets. In his appraisal report dated October 14, 1965, Wallace indicated the following items of valuation: Office
$ 43,200
Plant
444,810
Research Building 11,700 $499,710
Land and Land Improvements 66,250
Total
$565,960
Prior to November 17, 1965, Cuyahoga Management Corporation assigned to petitioner the negotiated contract to purchase the assets so that, at the closing, petitioner rather than Cuyahoga Management Corporation was the actual transferee of substantially all of the noncash assets of transferor. Before the negotiations culminating in the transfer of assets, there had been no relation of any kind between the management or principal stockholders of transferor and the partners, officers, directors or major stockholders of BB&K, owners of Cuyahoga Management Corporation, Cuyahoga Management Corporation itself, or petitioner. On November 17, 1965, petitioner, pursuant to the contract assigned by the original purchasing group, acquired from transferor $600 in a petty cash fund, certain sundry securities and prepaid *109 expenses, and all the transferor's accounts receivable, inventory, automotive equipment, land, land 782 improvements, buildings and machinery and equipment. Petitioner paid to transferor cash in the amount of $842,623.27, and, in addition, assumed liabilities of transferor totaling $405,588.04. Petitioner also placed $11,500 in escrow to cover $9,500 in transferor's estimated Indiana gross receipts tax and $2,000 in transferor's estimated liquidation costs. In the aggregate, transferor realized, and petitioner incurred as cost, a total of $1,259,711.31 in the sale and purchase of the assets transferred. As transferor received cash of $842,623.27 from petitioner, (the remainder of the sales price being composed of assumed liabilities and escrowed estimated liabilities) that amount, when added to the $1,175,621.33 cash on hand or in banks retained by the transferor, provided an amount of $2,018,244.60 available on transferor's complete liquidation, designed to net transferor's stockholders $11.40 per share in liquidation. After the sale and purchase, transferor's stockholders were paid $11.40 per share, and transferor was liquidated. The assets sold and transferred by transferor to petitioner *110 pursuant to the sales contract consisted of assets which were carried on transferor's books at November 17, 1965, as follows: Assets Transferred
Book Value
Cash
$ 600.00
Sundry Securities
1,032.38
Prepaid Expenses
21,499.37
Accounts Receivable
237,421.08
Inventory
488,508.04
Automotive Equipment
18,228.84
Land
15,443.66
Land Improvements
5,497.57
Buildings
344,585.16
Machinery and Equipment 9,609.12
TOTAL
$1,142,425.72
The stipulated fair market values of the following assets sold and transferred by transferor to petitioner, as of November 17, 1965 were as follows: Fair Market Value
Item
November 17, 1965
Cash
$ 600
Sundry Securities
1,725
Accounts Receivable
237,421
Inventory
488,508
Prepaid Expenses
21,499
Automotive Equipment
24,000
Land
36,250
Land Improvements
Not Stipulated
Buildings
Not Stipulated
Machinery and Equipment
Not Stipulated On November 17, 1965, the land improvements sold and transferred consisted of such items as fencing, paving and rail siding. On November 17, 1965, the buildings sold and transferred consisted of the processing plant, packing, warehouse and other supportive buildings (of which there were approximately 40), all but a few of which were contiguous. The plant layout and integration of machinery *111 and equipment were functionally obsolete. On November 17, 1965, the machinery and equipment sold and transferred consisted generally of metal working equipment, machinery for the manufacture and application of frit, utility equipment and miscellaneous supplemental items. The machinery and equipment had been recorded on the books of transferor with a total original cost of $1,274,969.50, with a remaining net book value as of November 17, 1965, of $9,609.12. The machinery and equipment was old and obsolete, single purpose equipment, lacking in modern convenience with which machinery today is equipped. Some of it had, in fact, been transferred to the plant from transferor's former parent company in Beaver Falls, Pennsylvania, as early as 1916. Much of it was run-down and showed evidence of considerable repair and a reworking of a character described as "baling wire and rope-type of repair." The machines were not equipped with modern devices such as air clutches, motorized rams, V-belts or knockout punches. In most cases they were equipped only with spring counter balances with the result that they were very difficult to maintain and operate. More than half of the equipment in the metal *112 shop was belt-driven from a shaft although it has been at least 25 years since belt-driven machinery was last widely sold and used in industry. The rotary smelters were of a type made in Germany shortly after World War I. Prohibitive expense was involved in remaking worn and broken parts of machines no longer in production by any manufacturer. The unidentifiable number of employee man-hours spent keeping it going, and the requirement of constant surveillance by its operators, rendered it much less efficient than more modern equipment would have been, and even then it was capable of production at a rate of only about one-half to one-third that attained by modern equipment. A new labor force would have had great difficulty in operating the machinery and equipment, as the machinery and equipment remained operable, to a great extent, 783 because of the skill, care and experience of the existing work force and the management. The abrasive nature of frit and the corrosiveness of acid tended to cause the machinery and equipment to wear more rapidly than normal, and thus reduced the value it otherwise may have had. Transferor's repair and maintenance expenses were substantial for several years *113 prior to the sale transaction, such expenses ranging from approximately $77,000 to $100,000 from 1962 to 1965. Although there was no particular breakdown of these amounts as to which specific assets they applied (land improvements, buildings or machinery and equipment), the machinery and equipment did account for an increased, higher than normal maintenance cost as the processes used by transferor were fairly obsolete. The very high maintenance and repair expenses required for the machinery and equipment resulted in production being significantly attributable to those expenses as compared to the intrinsic productivity value of the machinery and equipment itself. Petitioner did not seriously consider the possibility of shifting to other kinds of manufacturing operations if the existing operations became unprofitable because it was obvious that no such shift could be made. The major machinery and equipment was not adaptable to any other use. Those machine tools which were theoretically adaptable to other uses were old and lacking in features which were required in order for such machines to be competitive in today's manufacturing world. The machinery and equipment had been examined by *114 the original purchasing group, and they concluded that it had very little value, and in liquidation it would be practically worthless. Accordingly, BB&K had no appraisal made at the time of the sale transaction for the reason that knowledge gained from their own experience with many old plants would have compelled them to disregard any appraisal which indicated a substantial value. However, BB&K did consider that the machinery and equipment had some value insofar as it was part of an existing profit-making entity, and as single purpose equipment for making frit and doing porcelain enameling, to be used in that capacity as it was situated right in that spot. The highest and best use of the machinery and equipment was the manufacture of frit and the application of porcelain enamel in the place where it was already installed. On their respective books and records, transferor and petitioner allocated the total sales proceeds to the particular categories of assets sold according to the respective book values of the assets in those categories, part of the sales proceeds being allocated according to the specific face amount of the particular book values of some assets, and the remaining *115 sales proceeds being allocated on a pro rata basis according to the relative book values of the remaining assets as follows: Sales Price
Assets Sold
Allocated
Cash
$ 600.00
Sundry Securities
1,032.38
Prepaid Insurance
21,499.37
Accounts Receivable
237,421.08
Inventory
488,508.54
Automotive Equipment
23,126.71
Land
$ 19,601.03
Land Improvements
6,978.57
Buildings 437,253.34 463,832.94
Machinery, Equipment and Installations 12,190.29
[2] $1,248,211.31
In computing its Federal income tax for the period January 1, 1965 to November 17, 1965, transferor determined its gains (or losses) on the sale of assets to petitioner using the above allocation of sales proceeds in such computations. On its Federal income tax return for the period January 1, 1965 to November 17, 1965, transferor, among other items, reported taxable ordinary gain on the sale of the following section 1245 assets according to the recapture of depreciation provisions of section 1245: Post-1961
Section 1245
Depreciation
Gain
Gain Reported
Land Improvements
$ 9,222.40
$1,481.00
Not Reported
Machinery and Equipment
374,190.59
2,581.17
$2,581.17
Automotive Equipment
14,838.03
4,897.87 4,897.87
Total
$7,479.04
*116 784 No gain or loss was reported on certain assets because the allocated sale proceeds equaled the basis of the property. Certain other gains (or losses) were reported as not recognized under the provisions of section 337, providing for nonrecognition of certain gains and losses incurred in the sale of assets by a corporation in the process of complete liquidation. In 1967 petitioner executed and delivered to respondent Form 2045, Transferee Agreement. By reason of said agreement, petitioner became, and is, a transferee at law within the meaning of section 6901 and as such is liable for deficiencies in income tax that may be due from the transferor for the taxable year 1962 and the period January 1, 1965 to November 17, 1965, plus interest thereon as provided by law. In his statutory notice of deficiency, respondent determined against petitioner, as transferee, deficiencies in income tax of I-R Inc. (formerly old Ingram-Richardson) for the taxable year 1962 in the amount of $5,087.44 and for the period January 1, 1965 to November 17, 1965 in the amount of $170,390.61. Among other items which have been disposed of and are not at issue in this case, respondent determined the following *117 fair market values of assets sold by transferor to petitioner on November 17, 1965, and computed the allocation of the total sales proceeds according to the relative fair market values so determined: Allocation of Lump Sum Sales Price Amongassets Sold Based on Fair Market Value for Taxable Period November 17, 1965
Lump Sum Sales Price
$2,018,245.31
Less Cash or Cash Equivalent
$2,018,245.31
Less Cash or Cash Equivalent Cash
$453,990.96
Eaton-Howard Fund (sold-cash received) 316,643.04
770,634.00
Sales Price to be Allocated to Remainingassets
$1,247,611.31
Percentage of
Fair Market
Fair Market
Value to Total
Value Novem-
Fair Market
Allocation of
Item
ber 17, 1965
Value of Assets
Salesprice
Sundry Securities
$ 1,725
.85
$ 1,060.47
Accounts Receivable
237,421
11.709
146,082.81
Inventory
488,508
24.091
300,562.04
Prepaid Expenses
21,499
1.060
13,224.68
Land Improvements
30,000
1.479
18,452.17
Buildings
499,710
24.643
307,448.86
Machinery & Equipment
687,780
33.918
423,164.80
Automotive Equipment
24,877
1.277
15,308.19
Land 36,250
1.788
22,307.29
$2,027,770
100.000
$1,247,611.31 785 The allocation of the sales proceeds, the adjusted basis of the assets sold, and the resultant gains were determined as follows, with respect to section 1245 property: *118 Machinery and Equipment
Sales Price
$423,164.80
Basis
Book Value
$ 9,609.12
Depreciation disallowed in
Statutory Notice 50,549.71
60,158.83
Gain on Disposition
$363,005.97
Limitation on Gain
Depreciation Claimed Since 1/1/62
1962
Claimed per return
$62,289.83
Addl. allowed per examination
45,831.13
1963
Claimed per return
66,457.86
Addl. allowed per examination
42,076.84
1964
Claimed per return
106,985.20
Period ended November 17, 1965
determined in Statutory Notice 0
Total Depreciation Claimed or Allowed
$323,640.86
Ordinary Income on Disposition of Machinery& Equipment
$323,640.86
Automotive Equipment
Sales Price
$ 15,308.19
Basis
Book Value 11/17/65 $ 18,228.84
18,228.84
Gain on Disposition
0
Ordinary Income on Disposition of Automotive Equipment
o
Land Improvements
Sales Price
$ 18,452.17
Basis
Book Value 11/17/65 $ 5,497.57
5,497.57
Gain on Disposition
$ 12,954.60
Limitation on Gain
Depreciation Allowed since 1/1/62
1962 Allowed per examination
$ 2,076.16
1963 Allowed per examination
2,243.50
1964 Allowed per return
2,549.90
Period ended 11/17/65 allowed
per return 2,352.84
Depreciation allowed since 1/1/62
$ 9,222.40
Ordinary Income on Disposition of
Land Improvements $ 9,222.40
Total Ordinary Income received from the Disposition of 1245 Property
$332,863.26
Reported per return Machinery & Equipment
$ 2,581.17
Automotive Equipment
4,897.87
Land Improvements 0
( 7,479.04)
Ordinary Income from Disposition of 1245 Property
understated
$325,384.22
*119 Respondent determined as ordinary gain the amount of gains (to the extent of post- 1961 depreciation) attributable to machinery and equipment ($323,640.86), automotive equipment (0), and land improvements ($9,222.40), totaling $332,863.26. As transferor had reported $7,479.04 as ordinary gain from disposition of section 1245 property on its tax return for the period January 1, 1965 to November 17, 1965, respondent determined that transferor had understated ordinary income from disposition of section 1245 property in the amount of $325,384.22. The parties have stipulated certain facts which conflict with the notice of deficiency. In the notice of deficiency, respondent allocated $1,247,611.31 of a sales price of $2,018,245.31, (less cash or cash equivalent 786 items of $770,634) to the remaining noncash items. As stipulated by the parties, the amount of sales proceeds to be allocated to noncash items is the amount of $1,259,111.31. This is the total sales price of $1,259,711.31 (being composed of $842,623.27 cash, $405,588.04 assumed liabilities and $11,500 escrowed estimated liabilities), less $600 specifically attributable to petty cash. In addition, respondent urges on brief that *120 a modification be made of his original fair market valuation of machinery and equipment as was determined in the notice of deficiency. Accordingly, respondent's contention is that the following schedule is a correct computation of the issues raised in the notice of deficiency in determining the fair market value allocation of the sales proceeds, less $600 specifically allocated to petty cash, and the resulting gains or losses: Allocation of Adjusted
Assets
Market Value
Percent
Purchase Price
Basis
Gain or (Loss)
Sundry Securities
$ 1,725.00
.09
$ 1,133.28
$ 1,032.38
100.90
Accounts Receivable
237,421.00
12.01
151,219.23
237,421.08
(86,201.85)
Inventory
488,508.00
24.72
311,252.24
488,508.04
(177,255.80)
Prepaid Expense
21,499.00
1.09
13,724.31
21,499.37
(7,775.06)
Land Improvements
30,000.00
1.52
19,138.49
5,497.57
[3] 13,640.92
Buildings
499,710.00
25.28
318,303.26
344,585.16
(26,281.90)
Machinery & Equipment
637,500.00
32.25
406,063.30
9,609.12
[3] 396,454.18
Automotive Equipment
24,000.00
1.21
15,235.24
18,228.84
[3] ( 2,993.60)
Land 36,250.00
1.83
23,041.73 15,443.66
7,598.07
$1,976,613.00
100.00
$1,259,111.08
Pursuant to concessions by the parties, transferor's post-1961 depreciation *121 has been increased over the amount that was first allowed in respondent's notice of deficiency; a depreciation charge of $50,549.71 for the period January 1, 1965 to November 17, 1965, was initially disallowed. As of November 17, 1965, depreciation allowed (or allowable) to transferor after December 31, 1961, for Federal income tax purposes, was, with respect to certain assets, as originally reported by transferor on its tax return as follows: Land Improvements
$ 9,222.40
Machinery and Equipment
374,190.59
Automotive Equipment
14,838.03
However, each of the items of section 1245 property showing a gain on disposition, under respondent's computations on brief, would still result in a gain in excess of post-1961 depreciation. Accordingly, respondent finally contends on brief that the correct amount of ordinary gain realized from the disposition of section 1245 property is as follows: Machinery and Equipment
$374,190.59
Land Improvements
9,222.40
Automotive Equipment
Total
$383,412.99 According to respondent, this would result in an understatement of such income in the amount of $375,933.95 [4] *122 ; transferor had initially reported such income in the amount of $7,479.04. Ultimate Findings of Fact As of November 17, 1965, the fair market value of transferor's land improvements was $22,000. As of November 17, 1965, the fair market value of transferor's buildings was $355,000. As of November 17, 1965, the fair market value of transferor's machinery and equipment was $72,708. Opinion The ultimate issue in this case involves the determination of gain or loss to be recognized on the disposition of certain assets by transferor in selling substantially all of its noncash assets to petitioner on November 17, 1965, pursuant to a liquidation under the provisions of section 337. The determination of gain or loss on these issues will automatically determine the availability *123 of a net operating loss carryback to the taxable year 1962. As petitioner's status in this case is that of transferee of transferor's possible income tax liabilities, the transactions involved herein are focused on transferor's, rather than petitioner's, position in the transaction at issue. 787 As the sale of assets by transferor to petitioner was pursuant to the provisions of section 337, the general rule is that no gain or loss would be recognized to transferor on such disposition of assets. Certain exceptions to that general rule provide that gain or loss is recognized with respect to the disposition of assets to which section 1245 applies and also with respect to the disposition of installment obligations. The first issue in this case involves the effect of section 1245 on the sale of assets by transferor to petitioner. The second issue involves the effect of the provisions of section 337(b)(1)(B) requiring recognition of gain or loss on disposition of installment obligations. With respect to the first issue, we must first determine the allocation of the lump sum sales proceeds in order to compute the gain or loss on the individual categories of assets involved in the transfer. *124 To the extent of post-1961 depreciation, gain attributable to section 1245 assets would be reportable as ordinary gain. If, as a result of our determination of the allocation of the sales proceeds, there is a resulting loss attributable to the accounts receivable, then, as a second issue, we must determine whether such loss is recognizable as the disposition of an installment obligation within the meaning of section 337(b)(1)(B). In the application of section 1245 to the transaction, the regulations [5] thereunder provide that the lump sum sales proceeds should be allocated between items of section 1245 property and items of nonsection 1245 property in proportion to their respective fair market values in order to compute the respective gains or losses. Thus, in order to effect the computational allocation formula, we must determine the fair market values of each of the categories of assets involved in the transaction. Bryant Heater Company and Dresser Industries, Inc. v. Commissioner, 231 F. 2d 938 (C.A. 6, 1956), remanding a Memorandum Opinion of this Court; F. & D. Rentals, Inc., 44 T.C. 335 (1965), affirmed 365 F. 2d 34 (C.A. 7, 1966), certiorari denied 385 U.S. 1004 (1967); C.D. Johnson Lumber Corporation, 12 T.C. 348 (1949). *125 Some of the fair market values have been *126 stipulated by the parties: Cash
$ 600
Sundry Securities
1,725
Accounts Receivable
237,421
Inventory
488,508
Prepaid Expenses
21,499
Automotive Equipment
24,000
Land
36,250
Therefore, in order to complete the computational formula, we must determine the fair market values, as of November 17, 1965, of the remaining assets transferred by transferor to petitioner: land improvements, buildings and machinery and equipment. Respondent's position is that the valuation of such assets must include a "going concern" value element to reflect the fact that the assets were situated as part of a going business with immediate earning capacity. Jack Daniel Distillery v. United States, 379 F. 2d 569 (Ct. Cl., 1967). Respondent contends that transferor's initial allocation based on book values of the assets in no way reflected a fair market value to include a going concern element. Respondent further contends that the fair market values of the assets in dispute are as follows, in order to account for this going concern value: Land Improvements
$ 30,000
Buildings
499,710
Machinery and Equipment
637,500 It should be noted that the aggregate fair market values thus resulting from respondent's assertions would total $1,976,613 *127 for a transfer of assets, the actual sales price of which is stipulated to have been $1,259,711. Petitioner, on the other hand, urges that the fair market values of the assets were admittedly higher than the book values as initially reported. However, petitioner continues, any going concern element in the fair market values of the assets in dispute is 788 adequately accounted for in the following asserted fair market values: Land Improvements
$ 22,000
Buildings
355,000
Machinery and Equipment
72,708
Petitioner's asserted fair market values would put the aggregate fair market value figure at a total of $1,259,711, the amount of the stipulated total sales price. It is clear that the greatest discrepancy in the asserted fair market values is with respect to the machinery and equipment. Petitioner offers a two level approach to support his fair market value assertions. The first level incorporates the theory of a subtraction formula. More precisely, petitioner first would have us establish that the total fair market value of the aggregate assets was equal to the sales price of $1,259,711. From this, petitioner would have us subtract the stipulated fair market values of the assets not in dispute. *128 This, according to petitioner, would leave the amount of $449,708.31 as being the fair market value of the remaining assets. Continuing, petitioner has sought to establish by independent evidence the fair market values of the land improvements and buildings at $22,000 and $355,000, respectively. The remaining amount of $72,708 would then be, according to petitioner, mathematically and logically the only amount which could represent the fair market value of the machinery and equipment. In order to bolster the fair market value thus attributed to the machinery and equipment under this subtractive theory, petitioner, on a second level, has introduced independent evidence to the effect that corroborating appraisals have resulted in substantiating the fair market value subtractively attributed to machinery and equipment. Respondent urges a rejection of petitioner's subtractive theory and asserts that the fair market value of the respective assets at issue must be determined individually, without regard to any overall limitation based on the total sales price of the aggregate assets. Respondent has also introduced evidence to support his valuations. Respondent's only witness was a valuation *129 engineer with ten years' experience with the income tax division of the Internal Revenue Service. His testimony was offered only with respect to establishing the fair market value of the machinery and equipment, and he testified that in his opinion the fair market value of the machinery and equipment, as of November 17, 1965, was at least $637,500. The testimony of this expert indicates that, in substance, he used a replacement cost approach. As a general proposition, replacement cost has not been favored for tax purposes in arriving at fair market valuations. National Packing Corp., 24 B.T.A. 952 (1931); Appeal of Red Wing Linseed Co., 5 B.T.A. 390 (1926); and Berg v. United States, 167 F. Supp. 756 (W.D. Wisc., 1958). Although a fair market value should reflect the "in place" or "going concern" element of value of a preexisting assemblage of assets already engaged in the production process, this does not necessarily have to be reflected by a replacement cost approach under which the resulting valuation assumes a hypothetical new plant. [6] *130 In this case, replacement cost (less depreciation) is not a particularly good method to accurately identify the fair market value of the assets in dispute, especially the machinery and equipment. [7] *131 In the first place, it would be virtually impossible to identify a real replacement value today for much of petitioner's machinery and equipment because of the obsolescence factor. Therefore, the replaceability of the machinery and equipment is highly suspect to begin with. Even if it were possible to replace some of the machinery and equipment with functionally equivalent assets (as identical assets are in many cases no longer available), the facts of record indicate that such functional replacement would have been prohibitive because of the high cost in relation to expected return. Thus, in a real 789 sense, much of the machinery and equipment was irreplaceable; it was a herd of white elephants. Secondly, the estimation by respondent's expert witness of a remaining one-half useful life to account for depreciation does not appear to have any sound basis of facts in evidence. [8] In summary, we find respondent's evidence unpersuasive in establishing the fair market value of the machinery and equipment at $637,500. *132 No evidence was offered by respondent with respect to the valuation of land improvements or buildings except for the valuations initially ascribed in the appraisal made in preparation of the notice of deficiency. Petitioner's evidence in support of his position included testimony of expert witnesses and persons associated directly with the transaction at issue. Testimony was given to support both petitioner's subtractive approach and the independent asset valuation approach. In laying a foundation for its subtractive approach, petitioner sought to establish that the total sales price of $1,259,711.31 should be deemed the best available evidence to establish the fair market value of the aggregate assets. It is asserted by petitioner that the actual arm's-length transaction in this case is the best evidence of fair market value with respect to the aggregate assets involved. United States v. Davis, 370 U.S. 65 (1962); Guggenheim v. Rasquin, 312 U.S. 254 (1941); Philadelphia Park Amusement Co. v. United States, 126 F. Supp. 184 (Ct. Cl., 1954); Tripp v. Commissioner, 337 F. 2d 432 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court; Kalmon Shoe Manufacturing Company v. Commissioner, 321 F. 2d 189 *133 (C.A. 8, 1963); affirming a Memorandum Opinion of this Court; Gravois Planning Mill Co. v. Commissioner, 299 F. 2d 199 (C.A. 8, 1962), reversing a Memorandum Opinion of this Court; Hinkel v. Motter, 39 F. 2d 159 (D. Kan., 1930). An initial problem is to what extent should the sale transaction determine fair market value of those assets sold in bulk, where there are indications that the transaction, at least with respect to transferor, was bargained for on the basis of the ultimate per share liquidation value of the stock. We think that such considerations on the part of transferor do not result in making the sales price of the aggregate assets sold any less a measure of fair market value where the arm's-length nature of the transaction remains unchallenged. It has been held that actual sale of stock transactions may be utilized in measuring the value of the underlying corporate assets. Wilson E. Schmick, 3 B.T.A. 1141 (1926). See also Kalmon Shoe Manufacturing Company, supra; Hinkel v. Motter, supra.We conclude that the fact that the liquidation value of the stock of transferor was an element in the transferor's thinking in determining the ultimate sales price of the assets does *134 not prevent the sales price finally agreed upon from being evidence of the value of those assets. Notwithstanding the desires of transferor to obtain a consideration which would result in a particular per share liquidation amount, it must be kept in mind that the transaction itself was in form and in substance a sale of assets. We are not persuaded that transferor would have sold its assets for an amount substantially below their fair market values merely to effect a predetermined per share liquidation amount of proceeds. Morton J. Keedy, president of petitioner and formerly president of the predecessors, old Ingram-Richardson and I-R, Inc., offered testimony to establish the reasonableness of the purchase price in evidencing the fair market value of the operations. His belief was founded not only on his own long time personal experience as president of the company, but also on consultations with the company's attorneys, auditors, underwriters and directors, each with a personal degree of familiarity with the compay and bearing their respective professional expertise in the matter. 790 Further, the record discloses that the per share trading value of transferor's stock and the stock *135 price pursuant to the tender offer prior to the sale of assets were substantially below the amount transferor desired to effect in liquidation distribution. If anything, this would indicate that the asset sales price as offered by the original purchasing group, viewed from a liquidating per share value, and accounting for the assumed liabilities, was itself generous when compared to the trading market value of transferor's stock. We also not that the higher offer made by the original purchasing group in 1961 in no way impugns our belief in the reasonableness of the final offer of $1,259,711.31 in 1965. It is clear that transferor's business had suffered from its individual sales problems and also from those of the industry in general. This substantial decrease in earnings power substantially contributed to the lower value of transferor's business as a going concern, and, hence, the lower offering price in 1965. This point was affirmed by E.P. Cawley, a representative of the original purchasing group, in his testimony relevant to the factors considered by the original purchasing group in making the offers in 1961 and 1965, and is adequately borne out by viewing transferor's earnings *136 record over the years. Respondent contends that the fair market values urged by petitioner do not reflect any "going concern" element in the value of the assets. It would seem that this "going concern" or "in place" value element would have decreased significantly between the time of the 1961 offer and the 1965 offer. Certainly the decrease in earnings indicates that the going concern value of the assets, even as they were "in place" in a production process, was not as great in 1965 as it once was. That the petitioner did in fact purchase the assets in alump sum form, as a going operation, would indicate that the transaction did include consideration of any remaining going concern value at that time. We need not attempt to define any hypothetical figure "as if" there were a sale of a going concern, because there actually was such a sale, with all of the normal considerations attendant thereto. We think that the arm's-length nature of the transaction itself would suggest that since this was in fact the sale of transferor's entire operations, on a going concern basis, the bargained for exchange price would certainly reflect what there was still remaining of the going concern element *137 in 1965. This point also was expressly affirmed by Cawley's testimony as indicated above. Cawley's testimony was adequately supported and corroborated by the testimony of a licensed professional engineer, a director of the depreciation and evaluation services for Gilbert Associates, Inc., a firm of consulting engineers specializing in design consulting and management services. Based on the facts of record we conclude that the sales proceeds of $1,259,711.31 adequately represents a reasonable fair market value for the aggregate assets transferred. We must next consider whether the fair market value of the aggregate assets transferred should limit the sum total of the fair market values of the individual assets; or, did the sum of the fair market values of the assets on an individual basis exceed the fair market value of the assets in aggregate form? While it is often true that the fair market value of certain assets in the aggregate form of a going concern exceeds the sum of the composite assets on an individual basis, this is true because the utility value of certain assets is often higher where such assets are part of an integral operation. Such value is usually termed "going concern" *138 or "in place" value as opposed to isolated value, as we have discussed, supra. We conclude that in this case the sum of the fair market values of the individual assets is not higher than the fair market value of the aggregate assets. [9] 791 Respondent *139 cites several cases for the contention that, in certain circumstances, such sum of the fair market values of the individual assets may indeed by higher than the sales price of the aggregate assets. Respondent relies on Clifford Hemphill, 25 B.T.A. 1351 (1932) and Boise Cascade Corporation v. United Stes, 288 F. Supp. 770 (S.D.Idaho, 1968), affirmed per curiam 429 F. 2d 426 (C.A. 9, 1970) for the same proposition, and F. & D. Rentals, Inc., supra, in support of this argument. We have carefully considered all of these authorities and find that they are clearly distinguishable and do not support respondent's position in this case. We conclude and hold here that since the fair market value of the aggregate assets was $1,259,711.31, that amount should limit the sum of the fair market values of the individual assets as part of the sale of a going concern. To pursue petitioner's subtractive approach, it is contended that the land improvements and buildings had fair market values of $22,000 and $355,000, respectively. This would assertedly leave a remaining amount of $72,708 as the fair market value to be subtractively attributed to machinery and equipment. [10] *140 *141 With respect to establishing the fair market values of land improvements ond buildings, petitioner introduced considerable evidence by an expert witness who was personally familiar with transferor's operations and the transaction at issue. This witness testified that in his opinion the fair market values of certain of the properties in question on the critical date were as follows: Land
$ 36,250
Land Improvements
22,000
Buildings 355,000
Total
$413,250
We were much impressed by the knowledge, expertise and qualifications of this witness, as well as by his demeanor on the witness stand. We conclude that the fair market values of transferor's land improvements and buildings were, as of November 17, 1965, $22,000 and $355,000, respectively, as we have indicated in our findings. Following petitioner's subtractive approach, this leaves an amount of $72,708 which is asserted to be the fair market value of the machinery and equipment. In order to corroborate this fair markek value, petitioner also introduced independent evidence of the value of the machinery and equipment itself. Cawley testified to the effect that the machinery and equipment was practically worthless from the standpoint of its *142 individual, isolated value, and that the only value element involved would be as part of the operations as already in existence. He testified that whatever value element the machinery and equipment so situated had would certainly have been included in the sales price of transferor's enterprise as a going concern. Petitioner also introduced the testimony of an expert witness, whose company was engaged in the sale of machinery and equipment throughout Indiana and adjoining areas, and who had done business with and was familiar with the machinery and equipment and operations of, old Ingram- Richardson (and I-R, Inc) for over 15 years. Based on all the evidence before us, we conclude that the fair market value of transferor's machinery and equipment was, as of November 17, 1965, $72,708, and we have so found. Therefore, as of November 17, 1965, the respective fair market values of transferor's assets sold to petitioner were as follows: Cash
$ 600
Sundry Securities
1,725
Prepaid Expenses
21,499
Accounts Receivables
237,421
Inventory
488,508
Automotive Equipment
24,000
Land
$ 36,250
Land Improvements
22,000
Buildings
355,000
Machinery and Equipment 72,708
Total
$1,259,711 792 An allocation of the sales proceeds *143 of $1,259,711.31 according to these relative fair market values would effect the following computation of gains or losses with respect to the individual categories of assets: Allocated
Amount
Assets
Basis
Realized
Gain
Cash
$ 600
$ 600
N.A.
Sundry Securities
1,032
1,725
N.A.
Prepaid Expenses
21,499
21,499
N.A.
Accounts Receivable
237,421
237,421
N.A.
Inventory
488,508
488,508
N.A.
Automotive Equipment
18,229
24,000
$ 5,771
Land
15,444
36,250
N.A.
Land Improvements
5,498
22,000
16,502
Machinery and Equipment
9,609
72,708
63,099
Buildings 344,585
355,000
N.A.
TOTAL
$1,142,425
$1,259,711
Accounting for the post-1961 depreciation for each of the section 1245 assets, section 1245 ordinary gain would be as follows: [11]
Post-1961
Section 1245
Gain
Depreciation
Ordinary Gain
Automotive Equipment
$ 5,771
$ 14,838
$ 5,771
Land Improvements
16,502
9,222
9,222
Machinery and Equipment
63,099
374,191 63,099
TOTAL
$78,092 Of this total amount, transferor reported $7,479 on its tax return as section 1245 gain. Accordingly, transferor understated section 1245 gain by an amount of $70,613 *144 for the taxable period January 1, 1965 to November 17, 1965. Since our resolution of the above issue has resulted in there being no gain or loss attributable to the disposition of transferor's accounts receivable, it is not necessary for us to determine the effect of section 337(b) (1)(B) on such disposition. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. This amount did not include the $11,500 escrowed as part of the sales price.↩
3. Subject to recapture provisions of section 1245↩, where gain involved.
4. As respondent has conceded the disallowance of depreciation in the amount of $50,549.71 for the taxable period at issue without prejudice to account for such amount as subject to recapture provisions of section 1245↩, the amount of income initially returned to income via a disallowance of depreciation deduction is now allowed as a deduction but assertedly returned to income via recapture of that depreciation. Accordingly, such modification in respondent's position has not served to increase the deficiency per the statutory notice.
5. In case of a sale, exchange, or involuntary conversion of section 1245 and nonsection 1245 property in one transaction, the total amount realized upon the disposition shall be allocated between the section 1245 property and the nonsection 1245 property in propertion to their respective fair market values. In general, if a buyer and seller have adverse interests as to the allocation of the amount realized between the section 1245 property and the nonsection 1245 property, any arm's length agreement between the buyer and the seller will establish the allocation. In the absence of such an agreement, the allocation shall be made by taking into account the appropriate facts and circumstances. Some of the facts and circumstances which shall be taken into account to the extent appropriate include, but are not limited to, a comparison between the section 1245↩ property and all the property disposed of in such transaction of (i) the original cost and reproduction cost of construction, erection, or production, (ii) the remaining economic useful life, (iii) state of obsolescence, and (iv) anticipated expenditures to maintain, renovate, or to modernize.
6. For an extended discussion of the views of this Court on this point rejecting a replacement cost approach, see Philadelphia Steel and Iron Corporation, T.C. Memo. 1964-93, affirmed per curiam 344 F. 2d 964↩ (C.A. 3, 1965), and the authorities cited therein.
7. This conclusion is not contrary to the regulations involved herein. Although reproduction cost is indicated in the regulations as a consideration to be taken into account in making a fair market value allocation, this is limited to where such a consideration is "appropriate": [Some] of the facts and circumstances which shall be taken into account to the extent appropriate include, but are not limited to, a comparison between the section 1245↩ property and all the property disposed of in such transaction of (i) the original cost and reproduction cost of construction, erection, or production, * * *. [Emphasis added.]
8. See 10 Mertens, Law of Federal Income Taxation, sec. 59.06, p. 26 (and numerous cases of this Court therein cited): Reproductive cost must be adjusted for depreciation and obsolescence, and such adjustments should be backed up by a careful and detailed analysis. Adjustment for depreciation and obsolescence should not be made on a purely theoretical basis, but should reflect the actual reduction in market value resulting from wear, age and obsolescence. [Footnotes omitted.]↩
9. This is to be distinguished from the sales of items, not forming an integral part of a going concern, on a volume basis wherein the total price of items purchased in large quantities is less than if the items were purchased individually. Such situations occur mainly when the items are sold as items of production or inventory in a market where the seller is trying to increase his sales volume and yet maintain a profit. Usually, the smaller item-by-item profit resulting from lower prices for larger quantities is in fact more than offset by the greater increase in total profit due to increased volume. First of all, our situation does not involve a quantity sale of like items of production or inventory goods in the sense of marketing sales. It is a single transaction sale of assets not part of a plan to generate volume sales. Second, our situation involves a sale of property forming a going operation, not just a large quantity of like kind items.↩
10. See Kalmon Shoe Manufacturing Company v. Commissioner, 321 F. 2d 189(C.A. 8, 1963), affirming a Memorandum Opinion of this Court, wherein the Court of Appeals affirmed the Court's finding of the value and basis of a taxpayer's opening inventory. This Court found that the taxpayer had exchanged property worth $369,289.44 for this inventory and for other assets of a going concern. The taxpayer and respondent had agreed that the non-inventory items involved had a fair market value, on the relevant date, of $134,936.34. Following a subtractive approach, this Court found, and the Court of Appeals affirmed, that the inventory had a value, and hence a basis in the taxpayer's hands, of $234,353.10, notwithstanding questionabble evidence to the contrary. In Gravois Planning Mill Co. v. Commissioner, 299 F. 2d 199 (C.A. 8, 1962), reversing a Memorandum Opinion of this Court, the value of a life insurance policy was found in part by subtracting from the value of a package of assets the stipulated value of all the other assets involved. See also Copperhead Coal Co., Inc. v. Commissioner, 272 F. 2d 45 (C.A. 6, 1959), affirming a Memorandum Opinion of this Court, and George J. Staab, 20 T.C. 834↩ (1953), involving the subtractive approach in determining goodwill.
11. As applied to the instant case, sec. 1245 limits the gain recognized to the lesser of the actual gain realized or the post-1961 depreciation. Sec. 1245(a)(1) and (2), I.R.C. 1954↩.